UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIAN FRANCIS BATES,                   Case No. 17-11796

     Plaintiff                          Mark A. Goldsmith
v.                                       United States District Judge

AMERICAN AXLE AND                        Stephanie Dawkins Davis
MANUFACTURING, INC.,                     United State Magistrate Judge

     Defendant.
_____/

## REPORT AND RECOMMENDATION
## MOTION FOR SUMMARY JUDGMENT (Dkt. 25)

## I.     PROCEDURAL HISTORY

Plaintiff filed this wrongful termination action against his former employer, American Axle and Manufacturing, Inc. (AAM) on June 6, 2017. (Dkt. 1). Shortly thereafter, this matter was referred to the undersigned for all pretrial proceedings. (Dkt. 3). Plaintiff's amended complaint (Dkt. 16) is the controlling complaint in this matter. In the amended complaint, plaintiff asserts a race discrimination claim under Title VII (Count I), a race discrimination claim under 42 U.S.C. § 1981 (Count II), a race discrimination claim under the Michigan Elliot-Larsen Civil Rights Act (ELCRA) (Count III), a retaliation claim under ELCRA (Count IV), and a retaliation claim under § 1981 (Count V). (Dkt. 16). On February 15, 2018, defendant filed its motion for summary judgment, seeking

dismissal of all of plaintiff's claims.  (Dkt. 25).  Plaintiff filed his response on

April 6, 2018 and defendant filed a reply on April 23, 2018. (Dkt. 32, 33).

For the reasons set forth below, the undersigned **RECOMMENDS** that

defendant's motion for summary judgment be **GRANTED**.

## II.    FACTUAL BACKGROUND

On February 10, 2015, plaintiff Julian Bates applied to work in an entry-

level engineering position at AAM.  (Dkt. 25-2, Ex. A, Plf. Dep., p. 47).

According to AAM, James Borowiak, AAM's Senior Manager for Pass Car

Engineering, interviewed plaintiff in face-to-face meetings and made the decision

to hire him.  (Dkt. 25-2, Ex. A, pp. 116-118; Dkt. 25-3, Ex. B, Borowiak Dep., p.

38; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 3).  On March 20, 2015, plaintiff began his

AAM employment as a validation engineer for power transfer units – an entry level

engineering position.  (Dkt. 25-2, Ex. A, p. 57-58; Dkt. 25-3, Ex. B, Borowiak

Dep., pp. 52-53).  Plaintiff was the only validation engineer for power transfer

units reporting to Borowiak.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 4).  In that

position, plaintiff spent 90% of his time at AAM's Rochester Hills Technology

Center.  (Dkt. 25-2, Ex. A, p. 148; Dkt. 25-3, Ex. B, Borowiak, pp. 26-27; Dkt. 25-

5, Ex. D, Smith Dep., p. 19).  He was responsible for running tests on power

transfer units, breaking down parts, and writing reports for AAM and its customers

about how the parts performed.  (*Id*.; Dkt. 25-3, Ex. B, Borowiak Dep, pp. 8-9; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 4).

According to AAM, throughout plaintiff's employment, his work performance failed to meet its expectations.  (Dkt. 25-3, Ex. B, Borowiak Dep., p. 12, 14-15; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 5).  His performance deficiencies included failure to timely complete teardowns, failure to produce complete and adequate reports in a timely manner, and poor communication with his peers and supervisor.  *Id*.

As explained in its motion for summary judgment, AAM maintains a Performance Improvement Action Plan (PIAP) process to address poor job performance.  (Dkt. 25-5, Ex. D, Smith Dep., pp. 16, 22-24; Dkt. 25-6, Ex. E, Smith Dec., ¶ 3).  Under that process, a supervisor notifies the assigned Human Resources (HR) representative of the employee who is not performing at the required competency level.  (Dkt. 25-5, Ex. D, Smith Dep., p. 16; Dkt. 25-6, Ex. E, Smith Dec., ¶ 3).  HR assists the supervisor in developing a plan for the employee – including specific employment objectives, a defined timeframe for completing those objectives, intervention methods, and suggested frequency of follow-up meetings.  (*Id*.; Dkt. 25-3, Ex. B, Borowiak Dep., pp. 58-59.)

Under AAM's PIAP process, the supervisor is responsible for documenting the specific performance goals.  (Dkt. 25-3, Ex. B, Borowiak Dep., pp. 58-59; Dkt.

25-5, Ex. D, Smith Dep., pp. 16, 22-24; Dkt. 25-6, Ex. E, Smith Dec., ¶¶ 3-4).

AAM maintains that HR ensures that the goals are objective, verifiable, and fair.

(Dkt. 25-5, Ex. D, Smith Dep., pp. 16, 22-24; Dkt. 25-6, Ex. E, Smith Dec., ¶¶ 3-

4).  The supervisor and HR representative then meet once a week with the

employee to discuss the employee's performance against the goals.  *Id*.  The

supervisor provides feedback and a rating against the goals.  (Dkt. 25-3, Ex. B,

Borowiak Dep., pp. 58-59; Dkt. 25-5, Ex. D, Smith Dep., pp. 16, 22-24; Dkt. 25-6,

Ex. E, Smith Dec., ¶ 4).  HR further ensures that the process is communicated

clearly to the employee.  (Dkt. 25-5, Ex. D, Smith Dep., pp. 16, 22-24; Ex. E,

Smith Dec., ¶¶ 3-4.)  The employee is informed at the beginning of the PIAP

process that if sufficient improvement is not demonstrated within a minimum of 30

days, involuntary separation can be recommended.  (Dkt. 26-6, Ex. E, Smith Dec.,

¶ 5).

According to AAM, plaintiff exhibited poor job performance from the outset

of his employment.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 6).  Borowiak assigned

Lia Hale, a former validation engineer, to help train plaintiff.  (*Id*.; Dkt. 25-7, Ex.

F, Hale Dec., ¶ 5).  Hale says that plaintiff failed to timely complete assignments

from Hale and failed to communicate with her regarding those assignments.  *Id*.

For example, on May 1, 2015 and May 12, 2015, plaintiff did not respond to

Hale's requests to update a report.  (Dkt. 25-7, Ex. F, Hale Dec., ¶¶ 5-6; Ex. G,

5/2015 E-mails).  Two weeks later, Hale says she again asked plaintiff for the same update and – despite that being Hale's third request – he responded: "I didn't know that."  *Id*.  Hale reported to Borowiak that plaintiff was not able to perform his job. (Dkt. 25-7, Ex. F, Hale Dec., ¶ 6).  Plaintiff testified that he understood AAM's customers established timelines for when testing and reports had to be completed. (Dkt. 25-2, Ex. A, pp. 63-65).  He says he also understood that it was AAM's policy to have both Borowiak and the lead engineer approve completed reports within 21 days after testing.  *Id*. at pp. 142-143.  Despite knowing AAM's policy, defendant maintains that plaintiff repeatedly failed to timely complete tests, submitted incomplete reports, did not complete reports within the established 21-day deadline, and failed to properly communicate updates with and respond to questions from his peers and supervisor.  (Dkt. 25-3, Ex. B, Borowiak Dep., pp. 14-16; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 5).

For the first six months of plaintiff's employment, Borowiak maintains that he attempted to coach plaintiff and help improve his performance.  (Dkt. 25-3, Ex. B, Borowiak Dep., pp. 14-15; Ex. C, Borowiak Dec., ¶ 7).  Borowiak requested that plaintiff contact him twice a day in that regard.  *Id*.  Plaintiff concedes that he did not timely complete reports.  (Dkt. 25-2, Ex. A, pp. 145-147).  He claims that he failed to do so because Borowiak "micromanage[d]" him and "put his exact input on" the report.  *Id*.  Plaintiff testified that when he handed in a report, he did

5

"what's acceptable to me."  *Id*.  Borowiak says that he and the other engineers attempted to train plaintiff to timely and adequately complete the reports, but plaintiff's performance never improved.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶¶ 7-8).  Plaintiff also concedes that he was told to timely respond by phone or face-to-face when possible to other engineer's questions and to report developments.  (Dkt. 25-2, Ex. A, pp. 148-149; Dkt. 25-3, Ex. B, Borowiak Dep., pp. 14-15; Dkt. 25-5, Ex. D, Smith Dep., 18-19).  Plaintiff testified, however, that he thought it was best to communicate via e-mail and did not follow these instructions.  (Dkt. 25-2, Ex. A, pp. 148-149).

In October 2015, after Borowiak concluded that plaintiff's performance failed to improve, he contacted AAM's HR Department for assistance.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 9; Dkt. 25-5, Ex. D, Smith Dep., p. 10; Dkt. 25-9, Ex. H, Lizana Dec., ¶ 3).  Christina Lizana, AAM's HR Manager, requested that Borowiak provide a list of open items that needed to be completed.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 9; Dkt. 25-9, Ex. H, Lizana Dec., ¶ 3).  She then requested that plaintiff prepare a list of his concerns.  (Dkt. 25-2, Ex. A, pp. 125-126; Dkt. 25-9, Ex. H, Lizana Dec., ¶ 3; Dkt. 25-10, Ex. I, Informal PIAP).  On at least seven occasions from October 23, 2015 through December 17, 2015, Borowiak and/or Lizana met with plaintiff to provide him with coaching and feedback against the open items and to address his concerns.  (Dkt. 25-2, Ex. A, pp. 125-

126; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 9; Dkt. 25-9, Ex. H, Lizana Dec., ¶¶ 3-4.)

AAM says that these meetings were offered to plaintiff above and beyond what

AAM's policies called for.  (Dkt. 25-9, Ex. H, Lizana Dec., ¶ 3).

In the meetings with Borowiak and Lizana, plaintiff's primary excuse for

failing to timely and adequately complete assignments was his workload.  (Dkt.

25-2, Ex. A, pp. 128-129; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 10; Dkt. 25-9, Ex. H,

Lizana Dec., ¶ 4; Dkt. 25-10, Ex. I, Informal PIAP).  Plaintiff submitted a

description of his workload to Borowiak and Lizana that identified 64 tests that had

to be completed in two months.  (Dkt. 25-2, Ex. A, pp. 132-139; Dkt. 15-11, Ex. J,

Plf. Workload).  Plaintiff admitted at his deposition that (1) several of the tests did

not require any type of product teardown; (2) only 14 tests involved power transfer

units; and (3) he had not begun several of the tests in a timely manner.  (Dkt. 25-2,

Ex. A, pp. 132-139).  Borowiak and Lizana concluded that plaintiff's poor

performance was not caused by his workload.  (Dkt. 25-3, Ex. B, Borowiak Dep.,

pp. 29-30; Dkt. 25-4, Ex. C, Borowiak, ¶ 10; Dkt. 25-9, Ex. H, Lizana Dec., ¶ 4).

Rather, they concluded that there was ample time for plaintiff to complete the

subject testing and reports; his own inefficiency, failure to plan and prioritize tasks,

and unresponsiveness to others caused his poor job performance.  (Dkt. 25-4, Ex.

C, Borowiak Dec., ¶ 10-11; Dkt. 25-9, Ex. H, Lizana Dec., ¶ 4).  Plaintiff disputes

AAM's characterization, asserting that he was given more work and two other similarly situated employees.  (Dkt. 32, p. 5, citing Ex. 8 and Dkt. 25-4, pp. 31-32).

In the beginning of 2016, AAM maintains that plaintiff's performance had still not improved and he received a poor annual performance report.  (Dkt. 25-2, Ex. A, pp. 139-140, 157-158; Dkt. 25-12, Ex. K, Perf. Review).  Borowiak prepared the report with HR's guidance.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 12).  The report noted the following issues: (1) plaintiff was unprepared for both customer and internal program meetings; (2) he was not proactively planning his day and was waiting to be told what to do; (3) he failed to timely provide test results and reports; (4) his relationship with his peers was suffering mainly due to his failure to timely respond to them; (5) he failed to prioritize tasks; (6) he missed four training courses; (7) he needed to improve on meeting deadlines;  (8) he failed to timely respond to engineer validation questions despite being asked multiple times; (10) he failed to come to meetings on time and prepared; and (11) he failed to adequately write customer reports by not including concise conclusions, causing numerous reports to need to be rewritten.  (Dkt. 25-12, Ex. K, Perf. Review).

On February 22, 2016, Borowiak and HR business partner Elise Smith placed plaintiff on a formal PIAP.  (Dkt. 25-2, Ex. A, pp. 175-176; Dkt. 25-3, Ex. B, Borowiak Dep., pp. 58-59; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 13; Dkt. 25-5, Ex. D, Smith, pp. 16, 22-25; Dkt. 25-6, Ex. E, Smith Dec., ¶ 6; Dkt. 25-13, Ex. L,

PIAP).  In compliance with AAM's policy, Borowiak asserts that he documented

objective performance goals for plaintiff, and Smith discussed the goals with

Borowiak to ensure they were fair and clear.  (Dkt. 25-4, Ex. C, Borowiak Dec.,

¶ 13; Dkt. 25-5, Ex. D, Smith, pp. 16, 22-25; Dkt. 25-6, Ex. E, Smith Dec., ¶¶ 6-7).

As AAM describes it, the PIAP's goals consisted of tests, tasks, and reports that

plaintiff was responsible for, so that Borowiak and Smith could track plaintiff's

projects.  (Dkt. 25-13, Ex. L, PIAP).  AAM allotted plaintiff eight weeks within

which to achieve the goals and complete the tasks set forth in his PIAP.  (Dkt. 25-

4, Ex. C, Borowiak Dec., ¶ 14; Dkt. 25-6, Ex. E, Smith Dec., ¶ 7; Dkt. 25-13, Ex.

L, PIAP).  Borowiak and Smith maintain that they clearly described the PIAP's

goals to plaintiff and informed him that his failure to meet those goals would result

in the termination of his employment.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 14;

Dkt. 25-5, Ex. D, Smith Dep., pp. 16, 22-25; Dkt. 25-6, Ex. E, Smith Dec., ¶ 7; Ex.

M, PIAP Talking Points).

On February 23, 2016, the day after plaintiff was informed of the PIAP, he

complained to HR representative Smith about Borowiak.  (Dkt. 25-2, Ex. A, pp.

66-67; Dkt. 25-15, Ex. N, 2/23/2016 E-mail Chain).  Plaintiff first complained that

a Caucasian coworker had experienced Borowiak's "aggressive demands."  (Dkt.

25-2, Ex. A, pp. 82-83; Dkt. 25-15, Ex. N, 2/23/2016 Email).  He further

complained that several weeks prior, on January 27, 2016, during a conference

call, Borowiak said "we need to have a lynch party" in reference to an unnamed employee.  (Dkt. 25-2, Ex. A, pp. 68-80; Dkt. 25-15, Ex. N, 2/23/2016 Email).  Plaintiff says he was multi-tasking during the call when Borowiak allegedly made the comment and could not provide any additional facts or context to the alleged comment.  (Dkt. 25-2, Ex. A, pp. 68-80).  He testified that he was working on something else while on the call, did not know who Borowiak was referring to, and did not know what the unnamed employee had failed to do.  *Id.*  Plaintiff further testified that no one responded to Borowiak's alleged comment, and that he did not immediately take offense to the comment.  *Id.*

On February 25, 2016, plaintiff complained to Smith that a co-worker had also used the word "lynch" 10 months earlier.  (Dkt. 25-2, Ex. A, pp. 84-87; Dkt. 25-15, Ex. N, 2/23/2016 Email Chain).  Plaintiff alleged that on April 8, 2015, right after he was hired, Sal Grupido sent out a calendar invite for a "Lynch mtg." *Id*.  At the time, AAM used "Microsoft Lync" software for its phone conference system and employees referred to conference calls as "Lync meetings."  (Dkt. 25-2, Ex. A, pp. 85; Dkt. 25-4, Ex. C, Borowiak, ¶ 17).  Plaintiff wrote to Smith that he had assumed the spelling in the invite was a typo.  (Dkt. 25-2, Ex. A, pp. 87; Dkt. 25-15, Ex. N, 2/23/2016 E-mail Chain).[1]  But plaintiff also complained that

---

[1] Notably, on April 27, 2016, plaintiff sent an e-mail to an AAM coworker that made the same spelling error as Grupido, writing to his co-worker that he was on a "Lynch meeting." (Dkt. 25-2, Ex. A, pp. 90-91; Dkt. 26-16, Ex. O, 4/27/2016 Email).

on February 25, Grupido said jokingly during a meeting, "If I don't get it done soon I'm scared Jim is going to Lynch me."  (Dkt. 25-2, Ex. A, pp. 92-93; Dkt. 15-15, Ex. N, 2/23/2016 E-mail Chain).  Plaintiff attended this meeting by phone, he does not remember the other attendees, does not remember who Grupido was talking to when allegedly making the comment, and does not recall anyone's response.  (Dkt. 25-2, Ex. A, pp. 92-93).  Plaintiff testified that he did not say anything to Grupido about the alleged comment.  *Id*.

Smith met with plaintiff to discuss his complaints.  (Dkt. 25-2, Ex. A, pp. pp. 106-112; Dkt. 25-5, Ex. D, Smith, pp. 31-32; Dkt. 25-6, Ex. E, Smith Dec., ¶ 9).  Smith talked to a few of the witnesses to the alleged comments, all of whom denied hearing the word "lynch" used.  (Dkt. 25-5, Ex. D, Smith Dep., pp. 35; Dkt. 25-6, Ex. E, Smith Dec., ¶¶ 8-10).  Smith did not discuss the matter with Borowiak, because the PIAP process had just begun and she wanted Borowiak and plaintiff focused on improving plaintiff's performance.  (Dkt. 25-5, Ex. D, Smith Dep., pp. 32-35; Dkt. 25-6, Ex. E, Smith Dec., ¶ 11).  After the witnesses denied hearing anyone use the word "lynch," Smith met with plaintiff, told him the investigation was closed, and communicated that plaintiff should let her know immediately if there were any other incidents.  (Dkt. 25-2, Ex. A, pp. 113-115; Dkt. 25-5, Ex. D, Smith Dep., pp. 31-35; Dkt. 25-6, Ex. E, Smith Dec., ¶ 12).

Plaintiff did not report any other issues.  (Dkt. 25-2, Ex. A, pp. 113-115; Dkt. 25-6, Ex. E, Smith Dec., ¶ 12).

On April 25, 2016, after eight weeks of PIAP meetings with Borowiak and Smith, AAM concluded that plaintiff had not improved his performance.  (Dkt. 25-3, Ex. B, Borowiak Dep., pp. 14-16; Dkt. 25-4, Ex. C, Borowiak Dec., ¶¶ 15-16; Dkt. 25-5, Ex. D, Smith Dep., pp 22-25; Dkt. 25-6, Ex. E, Smith Dec., ¶ 13). Throughout his PIAP, AAM says that plaintiff did not show the ability to consistently complete his tasks in an effective and timely manner.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 15; Dkt. 25-6, Ex. E, Smith Dec., ¶ 13).  During this time, plaintiff missed customer meetings, lacked preparedness and material for presentations, and missed set deadlines for the completion of tests and reports, which caused management to constantly intervene.  *Id*.   On April 25, 2016, Borowiak made the decision to terminate plaintiff's employment.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 16; Dkt. 25-6, Ex. E, Smith Dec., ¶ 14).  AAM terminated plaintiff's employment effective May 5, 2016.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 16).

At the time Borowiak made the decision to terminate plaintiff's employment, he did not know plaintiff had made an internal complaint against him.  (Dkt. 25-2, Ex. A, pp. 113-116; Dkt. 25-3, Ex. B, Borowiak Dep., p. 61; Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 17; Dkt. 25-5, Ex. D, Smith Dep., pp. 32-35).

Although Smith had discussed the situation with the witnesses plaintiff identified, they all denied Borowiak said "lynch," and Smith did not involve Borowiak in the investigation in order to keep the PIAP process separate.  (Dkt. 25-5, Ex. D, Smith Dep., p. 35).

According to AAM, plaintiff admits that he has no evidence he was treated less favorably than any other employee.  (Dkt. 25-2, Ex. A, pp. 218-227).  Again, plaintiff disputes this characterization of his testimony, asserting that his workload was far higher than similarly situated employees.  In June 2016, Borowiak hired John Nelson-Johnson as plaintiff's replacement.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 18).  Like plaintiff, Nelson-Johnson is African-American.  *Id*.[2]

## III.   ANALYSIS AND CONCLUSIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that

---

[2] While neither party discusses the process to any great degree, it appears from various exhibits and deposition transcripts that plaintiff's claims were submitted to the Equal Employment Opportunity Commission and the State of Michigan Department of Civil Rights.  (*See e.g.*, Dkt. 32, Ex. 6; Dkt. 25-2, Ex. A, Plf. Dep., pp. 16-17).

the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477

U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.  Race Discrimination

Plaintiff's race discrimination claims are brought under Title VII, § 1981, and ELCRA.  "Both Title VII of the Civil Rights Act and § 1981 follow identical methods" for proving individual racial discrimination. *Bailey v. Oakwood Healthcare, Inc*., 2017 WL 3616478, at *7 (E.D. Mich. Aug. 23, 2017), aff'd, 2018 WL 1907166 (6th Cir. Apr. 23, 2018) (citing *Rosser v. Pipe Fitters Local 392*, 12 F.3d 214 (6th Cir. 1993).  It is equally well established that "claims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII." *Id*. (quoting *Dotson v. Norfolk S. R.R. Co.*, 52 Fed.Appx. 655, 657 (6th Cir. 2002).  Thus, all three of plaintiff's race discrimination claims are analyzed under the standards that governs Title VII discrimination claims.

To prove his race discrimination claim, plaintiff must establish that (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by someone outside the protected class or treated differently than a similarly situated, non-protected employee. *Deleon v. Kalamazoo Cnty. Road Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014).  In order to prevail in a Title VII employment

discrimination claim, a plaintiff must provide either direct evidence of intentional discrimination by the defendant or circumstantial evidence that would allow an inference of discriminatory treatment. *Talley v. Bravo Pitino Rest.*, 61 F.3d 1241, 1246 (6th Cir. 1995). If a plaintiff successfully establishes these four elements, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). If the defendant successfully supplies such a legitimate reason, the burden then falls on the plaintiff to demonstrate that the proffered reason is mere pretext. *Id*. at 804.[3] It is at this final stage in the instant case that plaintiff's race discrimination claim fails, because he has not established a material question of fact regarding element number four of the *prima facie* case. That is, he cannot show that he was replaced by a person in a non-protected class or that he was treated differently from any similarly situated employee(s) in a non-protected class.

It is undisputed that Borowiak replaced plaintiff with an African American employee. (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 18). Thus, it would appear that the only avenue open to plaintiff to meet his burden to demonstrate pretext is to show that one or more similarly situated employees in a non-protected class were treated

---

[3] While AAM also argues that it terminated plaintiff for a legitimate reason and that plaintiff offers no evidence of pretext, along with the "same-actor" defense, the undersigned finds it unnecessary to reach these issues because plaintiff has not established a *prima facie* case.

more favorably than he.  However, plaintiff points out that he filed his EEOC

complaint against AAM the day after he was fired and before his replacement was

hired, allowing AAM time to decide to hire someone in the same protected class in

order to strengthen its defense against plaintiff's discrimination claim.  (Dkt. 32, p.

15).  Plaintiff maintains that replacing him with another African American

employee is not enough to discredit his discrimination claims, citing *Connecticut v.*

*Teal*, 457 v. U.S. 440 (1982).  However, the undersigned agrees with AAM that

*Teal* is not applicable here.  In *Teal*, which was a disparate impact case, the

plaintiff challenged the employer's examination used for promotions.  The

employer sought to justify the examination by arguing that the "bottom line" of the

promotional process resulting in an appropriate racial balance.  The Supreme Court

rejected the notion "that disparate impact should be measured only at the bottom

line" because such a conclusion would ignore "the fact that Title VII guarantees

these individual respondents the opportunity to compete equally with white

workers on the basis of job-related criteria." *Connecticut v. Teal*, 457 U.S. at 451.

As AAM points out, this is not a disparate impact case and it has not sought to use

a "bottom line" defense.  *Teal* is simply not applicable here.  Plaintiff has come

forward with no evidence to dispute AAM's evidence that he was replaced by an

African American employee.  Plaintiff's suggestion that his replacement was less

qualified than him is both unsupported and of questionable relevance.  Plaintiff has

not alleged that his African American replacement was, in fact, unqualified; nor, assuming for the sake of argument only that the replacement was less qualified, has he cited authority suggesting that an employer's actions in replacing an employee with a less qualified, but nevertheless qualified, employee of the same protected class raises an inference of racial discrimination. Plaintiff's theory that AAM's hiring of his replacement was a calculation to enhance its defense before the EEOC is mere speculation untethered to any proof in the record or authority supporting its persuasive relevance. Thus, he cannot satisfy the fourth element of the *prima facie* case of discrimination to the extent it is based on any claim that "he was replaced by someone outside the protected class." *See Deleon*, *supra*.

Turning to the alternative grounds for establishing the fourth element of the *prima facie* case, less favorable treatment than members of a non-protected class, plaintiff's claim also fails. According to AAM, plaintiff testified that he has no evidence AAM treated a non-African American comparator more favorably and thus, his *prima facie* case also fails for this reason. Plaintiff disputes this testimony, saying that he was not in possession of needed discovery from defendant at the time of his deposition.[4] In his response brief, plaintiff now

---

[4] Throughout his response, plaintiff alludes to the notion that he requires additional discovery and refers to a motion to compel that he filed before filing his response. (*See* Dkt. 26). Plaintiff's motion to compel was denied and he did not file objections. (Dkt. 34). Plaintiff provides a declaration attached to his response, purportedly under Rule 56(d). (Dkt. 32, Ex. 1, Pg ID 814-815). In that declaration, plaintiff says that this matter should go to a jury because the parties stipulated as such. *Id*. citing Dkt. 14. AAM's stipulation to allow a jury to try any claims

maintains that he was assigned more work than Lia Benaglio (a white woman) and

Charles Wojdyla (a white man).  (Dkt. 32, p. 19, citing Ex. 8, p. 2, ¶ 3, Borowiak

Dep, 30:12-22; 31:11-32:7).  Plaintiff contends that he was treated less favorably

than Benaglio and Wojdyla in that they were promoted and he did not receive such

an opportunity.  Instead, Borowiak hired Samer Metry (a white man) as a product

engineer, even though Metry had less experience than plaintiff.  Plaintiff says that

Benaglio did not know that "PDT" stands for "Product Development Team,"

which should not be taken lightly nor should Metry's lack of automotive

experience.  Plaintiff says discrimination can be inferred from these facts because

the referenced employees were similarly situated in job roles "vertically above the

Plaintiff's validation engineer position" and because similarly situated employees

were allowed to stay with AAM, not be terminated, and to grow their careers

despite their lack of experience and knowledge.  (Dkt. 32, pp. 19-20).  Plaintiff

maintains that because he had more automotive experience that Metry and because

---

triable to a jury is not a stipulation that plaintiff's claims have merit or are not otherwise subject to summary judgment.  Moreover, plaintiff's declaration does not satisfy the requirements of Rule 56(d).  A motion under Rule 56(d) (to the extent plaintiff has even made such a motion) may be properly denied when the requesting party "makes only general and conclusory statements... regarding the need for more discovery and does not show how an extension of time would have allowed information related to the truth or falsity of [a document] to be discovered." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004).  Plaintiff did not demonstrate in his declaration his need for discovery or discuss with specificity, what material facts he hopes to uncover pertaining to his *prima facie* case for race discrimination or retaliation or any other issues raised in AAM's motion for summary judgment.  *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000).

Benaglio and Wojdyla progressed at AAM through the same framework, similarly situated white co-workers were treated more favorably than plaintiff when it came to career growth, without any adverse employment action.  (Dkt. 32, pp. 20-21).[5]

Plaintiff misapprehends his burden of establishing that he was treated differently than his proposed comparators.  Under Sixth Circuit law, to establish that he was treated differently than similarly-situated employees, he must show that he and his proposed comparators were similar in all relevant respects. *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 353 (6th Cir. 1998). Benaglio, Wojdyla, and Metry were product or design engineers while plaintiff worked as an entry level validation engineer with different job duties.  (Dkt. 25-7, Ex. F, Benaglio Dec., ¶ 1 (When Bates was employed at AAM, Benaglio was a product engineer; she had previously been a validation engineer.); Dkt. 25-2, Ex. A, Bates Dep, pp. 226-227 (Wojdyla was a design engineer when Bates worked at AAM, which was a different job than Bates had.); Dkt. 25-3, Borowiak Dep., p. 45 (Metry was a product engineer.).  Even if considered appropriate comparators in terms of having similar enough jobs, when a termination is disciplinary in nature, a

_____

[5] To the extent plaintiff's argument suggests that Borowiak is an appropriate comparator, the undersigned agrees with AAM's observation that Borowiak, as plaintiff's supervisor, is not similarly situated to plaintiff.  *See Curtis v. Earnest Mach. Prod. Co.,* 2012 WL 5879439, at *1 (S.D. Ind. Nov. 20, 2012) ("Plaintiff makes a misguided effort to compare himself to his supervisor, who is not similarly situated to Plaintiff for comparison purposes."); *Henry v. Delta Air Lines, Inc*., 2011 WL 3444089, at *9 (E.D. Ky. Aug. 8, 2011) (finding that plaintiff and her alleged comparator were not similarly situated, in part, because the alleged comparator was plaintiff's supervisor).

plaintiff must show that his proposed comparators engaged in acts of "comparable seriousness." *Wright v. Murray Guard*, *Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (quoting *Clayton v. Meijer*, *Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).  To make this assessment, the court may look to certain factors, such as whether the individuals "'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992)).  However, when such factors are not relevant, the court need not consider them.  *Id*.  Rather, to determine whether two individuals are similarly situated with regard to discipline, the court "make[s] an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee."  *Id*.

Plaintiff has offered no evidence that Benaglio, Wojdyla, and Metry engaged in the same conduct or conduct of comparable seriousness -- being unprepared for both customer and internal program meetings; not proactively planning and waiting to be told what to do; failing to timely provide test results and reports; maintaining poor relationship with peers mainly due to failure to timely respond to them; failing to prioritize tasks; missing four training courses; missing deadlines; failing to timely respond to engineer validation questions despite multiple requests;

failing to come to meetings on time and be prepared; and failing to adequately write customer reports by not including concise conclusions, causing numerous reports to need to be rewritten -- and were treated differently by AAM.  Plaintiff's claim that this is because he had a larger work load is not born out by the record. (Dkt. 32, p. 5).  Plaintiff alleges that he was given more work than Benaglio and Wojdyla, citing Exhibit 8, p. 2, ¶ 3.  In reviewing the referenced Exhibit, the undersigned is unable to discern how this exhibit supports plaintiff's claim of a larger workload.[6]  Plaintiff also cited Borowiak's deposition at pages 31 and 32, which relates to a project being reassigned from Sal Grupido to plaintiff.  (Dkt. 25-3, Ex. B, Borowiak Dep., pp. 31-32).  Plaintiff does not explain how this reassignment resulted in him having a higher workload than any of his proposed comparators.  Borowiak reviewed plaintiff's claimed workload, a description of which Lizana asked him to prepare (Dkt. 25-11, Ex. J), and determined that it was exaggerated because it included tests already completed, tests that did not involve teardowns, and tests that plaintiff had failed to complete in a timely manner.  (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 10).  Borowiak further averred that plaintiff's

---

[6] It is possible that plaintiff meant to refer to Exhibit 7, rather than Exhibit 8.  (Dkt. 32-1, Pg ID 937).  Exhibit 7 appears to be the narrative prepare by plaintiff and submitted to the EEOC in support of his discrimination claims.  In it, plaintiff claims that the validation engineer he replaced (Lia Hale, now Lia Benaglio) only had two programs to validate and he had 3 programs to validate just one month after he started and five programs by December 2015.  He claims he had more than double the workload of Benaglio.  He offers no evidence, other than his unverified narrative, to support this claim.

workload was no higher than others who were in his position before or after him. *Id*. at ¶ 11. Benaglio also states in her declaration that plaintiff had no more work than she did when she was a validation engineer. (Dkt. 25-7, Ex. H, Benaglio Dec., ¶ 4). Plaintiff's unsupported argument of a heavier workload does not cure his failure to provide proper comparator evidence. Under controlling precedent, plaintiff lacks evidence of the fourth element of a *prima facie* case, and his discrimination claims should be dismissed for that reason. *See e.g.*, *Johnson v. University of Cincinnati*, 215 F.3d 561, 587 (6th Cir. 2000) (where "plaintiff has presented no evidence to establish either that he was replaced by someone [outside his protected class] or that other [employees] who were similarly situated were treated differently," the Court held his discrimination claim "cannot survive").

C. Retaliation

As with discrimination claims, retaliation claims brought under Title VII, § 1981, and ELCRA are analyzed under the same standard.[7] *Thomas v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 2018 WL 3159708, at *6 (E.D. Mich. June 28, 2018). To establish a *prima facie* case of retaliation a plaintiff must establish that: (1) he engaged in a protected activity; (2) his "exercise of such protected activity was known by the defendant; (3) thereafter,

---

[7] Plaintiff's amended complaint does not contain a retaliation claim under Title VII. Rather, the retaliation claims are brought under § 1981 and ELCRA only.

the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 2018 WL 3629057, at *8 (6th Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014)). Under Sixth Circuit precedent, to satisfy the knowledge element for a retaliation *prima facie* case, plaintiff must show that AAM's "relevant management decisionmakers" knew of plaintiff's "exercise of protected activity." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999). "An employment decision cannot be caused by protected activity if the decisionmaker did not know about the protected activity." *Crane v. Mary Free Bed Rehab. Hosp*., 634 Fed. Appx. 518, 526 (6th Cir. 2015); s*ee also Garg v. Macomb County Community Mental Health Services*, 472 Mich. 263, 275-76 (2005) (Michigan Supreme Court held that where plaintiff "failed to show that defendant knew that she was engaged in [protected] activity … there could be no 'retaliation' on the employer's part"); and *Howard v. William Beaumont Hosp.*, 2013 WL 6730054, at *7 (E.D. Mich. Dec. 19, 2013) (Goldsmith, J.) ("[w]ithout either of [the decisionmakers] aware of [p]laintiff's protected activity, [p]laintiff cannot establish the knowledge component necessary for her *prima facie* case").

According to AAM, this is a straightforward issue based on uncontested record evidence because there is no dispute that Borowiak made the decision to

terminate plaintiff's employment without knowing plaintiff had complained internally to AAM's HR Department.   Thus, AAM maintains that plaintiff cannot establish the second and fourth elements of his *prima facie* case, meaning his retaliation claims must be dismissed.  *Mulhall*, 287 F.3d at 551-52; *Crane*, 634 Fed. Appx. At 526; and *Garg*, 472 Mich. at 275-76.  AAM also points out that plaintiff admits in his complaint that AAM's human resources "did not communicate [his complaint of discrimination] to Borowiak."  (Dkt. 16, Pg ID 89).

In response, plaintiff says that retaliation in this case exists because AAM dissuaded plaintiff from making discrimination complaints.  Smith told plaintiff that his discrimination concerns would be "extensively researched" despite resulting in findings that were "inconclusive."  Plaintiff says that Smith did not tell him that Borowiak was never interviewed or questioned concerning his discrimination complaint.  Therefore, since plaintiff was led to believe that Borowiak was investigated or interviewed based on his concerns (Dkt. 32, Ex. 8), due to Smith telling plaintiffs that his concerns were "extensively researched," plaintiff was dissuaded from making additional complaints.  Had plaintiff known that Borowiak was not actually questioned about plaintiff's complaint, plaintiff says he would not have been dissuaded from making additional complaints.  For example, plaintiff could have brought his discriminatory issues to someone situated vertically higher than Smith in the human resources department at AAM.

According to plaintiff, defendants in employment discrimination cases will commonly make the argument that the decisionmaker did not know of any complaints and this is just a legal strategy.

As explained in *Howard v. William Beaumont Hosp*., at *6, a critical element for a plaintiff's *prima facie* case is knowledge; "specifically, which decisionmakers, if any, knew of Plaintiff's protected activity." In order to satisfy the knowledge element, a plaintiff must show that the employer's "relevant management decision-makers" knew of the plaintiff's "exercise of protected activity." *Id*. (quoting *Fenton v. HiSAN, Inc*., 174 F.3d 827, 832 (6th Cir. 1999)). Generally, in "retaliation cases, the plaintiff will be able to produce direct evidence that the decision making officials knew of the plaintiff's protected activity. In many such cases, for example, the adverse action will be taken by the same supervisor to whom the plaintiff has made complaints in the past." *Howard*, at *6 (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002)). But a "plaintiff may survive summary judgment by producing circumstantial evidence to establish" knowledge. *Id*. In determining who is a decisionmaker, "courts consider the knowledge and motive of those who were 'meaningfully involved' in or influenced the adverse action." *Howard*, at *6 (citing *Wells v. New Cherokee Corp*., 58 F.3d 233, 238 (6th Cir. 1995)). "Courts distinguish between individuals who made the adverse decision and individuals who may have assisted with or carried out the

decision." *Id.* (citing *Cox v. Blue Cross Blue Shield of Michigan*, 2013 WL 1838314 (W.D. Mich. May 1, 2013).

Here, Borowiak says he made the decision to terminate plaintiff's employment on April 25, 2016, based on his poor performance. (Dkt. 25-4, Ex. C, Borowiak Dec., ¶ 16). He also avers that at the time he made the decision to terminate plaintiff, he did not know about plaintiff's complaint to HR. *Id.* ¶ 17. Smith, the HR representative who handled plaintiff's complaint, also states that she did not ask Borowiak about plaintiff's complaint. (Dkt. 25-6, Ex. E, ¶ 11). She explained at her deposition that Borowiak was not informed of the complaint because they had just started the PIAP with plaintiff, she wanted to ensure that they were successfully focusing on the PIAP, and she did not want anything taken away from that objective formal process. (Dkt. 25-5, Ex. D, Smith Dep., p. 33). Plaintiff does not dispute that Borowiak was the sole decisionmaker, and does not suggest that anyone who was aware of plaintiff's complaint participated in that decision. Further, the undersigned observes that nothing in the record suggests the existence of any additional decisionmakers. While Smith was aware of plaintiff's complaint and says that she "supported" Borowiak's decision to terminate Bates, there is no evidence that she participated in the decision. The circumstances of this case suggest that Smith's role was similar to the individual in *Howard* where the evidence showed the person was an HR professional, but not a decisionmaker in

the hiring or firing process. *Id*. at *7. Thus, Smith's knowledge of plaintiff's complaint does not satisfy the requirement for a retaliation claim that the decisionmaker had the requisite knowledge of plaintiff's complaint, and plaintiff has not adduced evidence to otherwise support decisionmaker knowledge. As a matter of logic, plaintiff cannot show that protected conduct about which the decisionmaker had no knowledge was the cause of his termination. Accordingly, plaintiff's retaliation claim must fail because he cannot satisfy the elements of knowledge and causation of his *prima facie* case.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant's motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 3, 2018                         s/Stephanie Dawkins Davis
                                             Stephanie Dawkins Davis
                                             United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on <u>August 3, 2018</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and I have mailed by United States Postal Service to the following non-ECF participant: <u>Julian Francis Bates, 3676 Haverhill, Detroit, MI 48224.</u>

                                             s/Tammy Hallwood
                                             Case Manager
                                             (810) 341-7887
                                             tammy_hallwood@mied.uscourts.gov